No. 41,612

DELBERT GARRETT, a Minor, By and Through J. C. GARRETT, SR., and FLOY M. GARRETT, Guardians, *Appellees*, v. BRACY, INC., a Corporation, and IMPERIAL CASUALTY & INDEMNITY COMPANY, a Corporation, *Appellants,* and MARY LIEBAU and BERYL FARROW, *Defendants.*

(356 P. 2d 815)

Opinion filed November 12, 1960.

*Emmett A. Blaes* and *James W. Sargent,* both of Wichita, argued the cause, and *W. D. Jochems, J. Wirth Sargent, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, Stanley E. Wisdom* and *Vincent L. Bogart,* all of Wichita, were with them on the briefs for the appellants.

*George A. Robb,* of Newton, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

WERTZ, J.: This was an action by plaintiff (appellee), Delbert Garrett, a three-year-old boy, appearing by his guardians, J. C. Garrett, Sr., and Floy M. Garrett, against Bracy, Inc., a corporation, and its insurance carrier, and Mary Liebau and Beryl Farrow, defendants, as joint tort-feasors, seeking to recover damages for personal injuries alleged to have been suffered due to the negligence of all the defendants.

The case was tried to a jury, which returned a general verdict for defendants Liebau and Farrow, and a general verdict in favor of the plaintiff and against defendants Bracy, Inc., and its insurance carrier, appellants herein. At the same time the jury returned answers to special questions finding appellants guilty of negligence which was the proximate cause of the injury to the plaintiff.

From an order of the trial court overruling appellants' post-trial motions and entering judgment for plaintiff, appellants appeal and assert that the trial court (1) abused its discretion in overruling their motion for continuance of the cause, because of the absence of one of their attorneys, and (2) erred in overruling their demurrer to plaintiff's evidence and their motion for a directed verdict at the close of all the evidence, for the reason that the testimony failed to establish any negligence on the part of appellants.

Our examination of the record with reference to appellants' first contention reveals that on July 8, 1958 plaintiff filed his petition against the aforementioned four defendants. The appellants, Bracy, Inc., and its insurance carrier, were represented by the firm of Jochems, Sargent and Blaes, which consisted of twelve members, and the other defendants, Mary Liebau and Beryl Farrow, were represented by four different law firms. On August 4 Mr. Sargent, one of appellants' counsel, was granted a continuance to answer. On September 26 plaintiff filed an amended petition. Again, Mr. Sargent failed to answer and after some correspondence between plaintiff's counsel and Mr. Sargent, an answer was filed November 8. On November 10, the opening of the trial term, the case was set for trial on January 20, 1959. However, this date conflicted with the schedule of one of defendants' counsel; a continuance was granted, and the case was set for trial on March 31. A companion case, involving the same litigants and the same counsel, was set for trial on April 7. Thereafter, on March 17, the court changed the setting of the instant case to April 7. On April 1 settlement negotiations between the parties broke down; on April 2 Mr. Blaes, one of appellants' counsel, notified other counsel in the case that he had a previous appointment in Washington, D. C., and advised the court to that effect.

On the day set for trial appellants filed a motion for continuance, supported by an affidavit of Mr. Blaes setting forth that he was a partner in the firm of Jochems, Sargent and Blaes, that appellants had employed the firm to defend the action and had requested him personally to participate in the case and trial thereof, that he had the major responsibility of handling the case, and that he had a previously existing commitment which required him to be in Washington, D. C., the week in which the matter was set for trial. Mr. Sargent, who had participated in framing the pleadings in the case, appeared to argue the motion and presented Mr. Blaes's affi-

davit. The court stated that everybody was present for trial, the jury was present, there were six law firms in the case with five of them representing the defendants and one the plaintiff, the case had been set for a long period of time and the motion for continuance would be overruled. Mr. Sargent stated he would proceed with the trial of the case on behalf of appellants.

For nearly 100 years it has been the settled law in this jurisdiction, beginning with *Ed. Ass'n v. Hitchcock,* 4 Kan. 36, that the granting or refusing of a continuance on account of the absence of a particular attorney is a matter resting largely in the sound discretion of the trial court. Unless abuse of such discretion is made to appear, no reversible error can be predicated on the trial court's ruling on this matter. Certainly the absence of an attorney does not necessarily require that a continuance be granted when associate counsel competent to represent the party seeking the continuance is in attendance. (*Farmers State Bank v. Crawford,* 140 Kan. 295, 296, 37 P. 2d 14.) See also *Markson v. Ide, Receiver,* 29 Kan. 700.

In *State v. Sweet,* 101 Kan. 746, 168 Pac. 1112, we held that in a prosecution for a felony it is not error to overrule a motion for a continuance based upon the absence of defendant's chief counsel, when the trial court is satisfied that the junior counsel hurriedly called into the case are experienced lawyers and thoroughly competent to conduct the defense and to protect the rights of the accused. See also *State v. Carter,* 122 Kan. 524, 253 Pac. 551; *State v. Miller,* 131 Kan. 36, 289 Pac. 483; *White v. Southern Kansas Stage Lines Co.,* 136 Kan. 51, 12 P. 2d 713; *Konitz v. Board of County Commissioners,* 180 Kan. 230, 234, 303 P. 2d 180; *Desch v. Carnutt,* 186 Kan. 238, 241, 242, 349 P. 2d 941; Annotation, 112 A. L. R. 593-618, and *Knickerbocker Printing Corp. v. United States,* 348 U. S. 875, 75 S. Ct. 112, 99 L. Ed. 689, Id., 75 S. Ct. 212, 99 L. Ed. 1292.

In *Gray v. Gray,* 6 Ill. App. 2d 571, 128 N. E. 2d 602, it was said:

"All the members of this court have practiced law and are familiar with the many problems of the busy trial lawyer. We understand and are sympathetic with the burdens placed upon him and with his reluctance to place a limit on his personal capacity. However, this must yield to what Mr. Justice Jackson, in *Knickerbocker Printing Corp. v. United States of America,* Adv. Rep., Supreme Court of the United States, Lawyers' Ed., Vol. 99, No. 1, 11/22/54, at p. 19, described as delayed justice which 'has become little less than scandalous.' In that case the Supreme Court of the United States was asked to extend the time for the filing of a petition for a writ of certiorari on

the ground that the applicant's attorney had become actively engaged in other matters. The Justice said:

" 'When more business becomes concentrated in one firm than it can handle, it has two obvious remedies: to put on more legal help, or let some of the business go to offices which have time to attend to it. I doubt if any court should be a party to encouraging the accumulation of more business in one law office than it can attend to in due time.'

Mr. Justice Jackson stated the matter entirely too mildly.

"The law's delay in many lands and throughout history has been the theme of tragedy and comedy. Hamlet summarized the seven burdens of man and put the law's delay fifth on his list. If the meter of his verse had permitted, he would perhaps have put it first. Dickens memorialized it in Bleak House, Chekhov, the Russian, and Moliere, the Frenchman, have written tragedies based on it. Gilbert and Sullivan have satirized it in song. Thus it is no new problem for the profession, although we doubt that it has ever assumed the proportions which now confront us. 'Justice delayed is justice denied,' and regardless of the antiquity of the problem and the difficulties it presents, the courts and the bar must do everything possible to solve it. We cannot entertain the indifference to it which some members of the trial bar have. Franklin's stoical observation 'Ca ira' ('It will pass'), as the events of the time cast their shadow in France, represents a current observation on this problem. It may pass, but with it may pass all regard which a long-suffering public has for the legal profession and for the courts. Commercial disputes are now generally submitted to arbitration and few, relatively speaking, are brought to court. Administrative bodies have been organized to bypass the insufferable delays and technicalities of the law. Accountants, engineers and businessmen have taken over in fields when the law failed to provide for the speedy adjustment of disputes.

"When a judge, out of timidity or professional sympathy, grants one lawyer an unwarranted continuance, he does an injustice not only to the opposing side but to the other litigants in that court. Moreover, it is within the knowledge of all of us that many a young and obscure lawyer, after waiting years before his case gets on the trial call, is then overwhelmed by the opposition of a more experienced or effective opponent who wins continuance after continuance. In despair he often settles for less than his case would warrant or he may lose his witnesses and his client."

*Buchanan v. Insurance Co.*, 94 Kan. 132, 146 Pac. 411, is a case somewhat similar to the instant one, wherein we said that the district court, having in mind the condition of the business to be disposed of, the time available for the purpose and the rights of other litigants, was required to exercise judgment and discretion in determining whether there should be a postponement.

In the instant case the trial judge, on the day set for trial, was faced by six attorneys representing the plaintiff and multiple defendants, three of them from outside his judicial district. A jury panel was ready to work and witnesses were in attendance. He was

asked to continue a case, causing loss of time to the court, the jurors, witnesses and attorneys for the respective parties. Mr. Blaes, attorney for appellants, had known for nearly three months that he was due in court to represent his clients. Mr. Sargent, a member of Mr. Blaes's firm, an experienced lawyer who had helped join the pleadings in the case, was present in court on the day in question, and an examination of the record reveals that he ably presented their clients' case. There is no complaint that he was incompetent or that if Mr. Blaes had been present at the trial the judgment would have been otherwise.

We said in *City of Wichita v. Houchens*, 184 Kan. 297, 335 P. 2d 1117, that we are in complete accord with the desire of courts to clear their dockets in order to save time and expense and expedite the courts' business. Such practice is not only commendable and should be encouraged, but it is necessary in order for all litigants to obtain impartial and timely justice.

The attorney and client relationship is a personal one, but the relationship of the attorney with the court is that of an officer of the court. A court has the right to expect counsel to show the utmost fairness toward the court. Were it not so, it would be impossible for courts to handle their dockets, which become more crowded each year. The client has a right to hire an attorney of his choosing, but in so hiring, neither the attorney nor the client has the right to dictate to the court the time and place the court shall do its business, and any arrangement made between an attorney and his client with reference to the trial of a case must be made subject to the approval of the court. It cannot be said there was any abuse of discretion by the court in ordering the case to trial in the absence of one of appellants' counsel.

Appellants' second contention is that plaintiff's evidence was insufficient to establish a *prima facie* case against appellants. They concede that if there was any competent evidence supporting the special findings of the jury and the general verdict, plaintiff should prevail on this issue. A determination of this question requires a brief review of the evidence.

On the day in question, Kenneth Holcomb, the agent and employee of Bracy, Inc., appellant, was driving a Mack diesel truck pulling a thirty-three-foot trailer, loaded with sacked and block salt, with an over-all length of forty-eight feet and a total weight of thirty-one and one-half tons. He had come through the business

district of Newton and was headed out of town, going east on Eighth Street, approaching the intersection of Eighth and High Streets with U. S. highway No. 50, concededly a dangerous intersection. Eighth Street runs east and west, High Street, going north and south, intersects it, and highway No. 50 comes into the same intersection from the northeast.

At the same time the plaintiff was riding as a passenger in an automobile driven by defendant Mary Liebau, traveling north on High Street and approaching the mentioned intersection from the south. Also, at that time defendant Beryl Farrow was parked in an automobile just north of the intersection, on the west side of High Street and just east of a grocery store. As Mrs. Liebau stopped her car at the stop sign, just before entering the intersection from the south, she looked to the west down Eighth Street and saw the Bracy truck approximately 400 feet away, west of the Missouri Pacific railroad tracks. She then proceeded into the intersection at a speed of eight to ten miles an hour. When she was in the intersection, going north, the Farrow car backed out, blocking High Street to the north, causing Mrs. Liebau to stop her car momentarily. She then put her car in motion, attempting to turn to the northeast and go along highway No. 50, at which time she again observed the truck, coming fast. She thought the truck was on the wrong side of the road and only heard its horn just a "flash second" before the collision. The Bracy truck first struck the left rear of the Liebau car as it was in about the center of the intersection. There was a second impact, broadside, with the Liebau car which pushed it through the cluster of poles at the northeast corner of the intersection and into a graveled driveway near a drive-in. At the time the Liebau car entered the intersection the truck was 400 feet to the west and traveling approximately thirty miles an hour. It was then that the truck reduced its speed to about twenty-five miles an hour to cross the Missouri Pacific tracks and again picked up speed, so that when it entered the intersection it was traveling approximately twenty-nine miles an hour.

Mr. Holcomb, the truck driver, testified that before crossing the Missouri Pacific tracks he was going thirty miles an hour; that he slowed down to about twenty-five miles an hour to cross the tracks, which were approximately 400 feet west of the intersection. He then shifted the gears to "third direct," which has a maximum speed of thirty-two miles an hour—each shift increases the truck's speed. He stated that he then gathered speed as he approached the curve

immediately to the west of the intersection. He also stated that he did not see the Liebau car when it stopped just before entering the intersection, but there was nothing to prevent his seeing the car at that time; that when he first saw the Liebau car he was about 115 feet from it and he could not stop in that distance. However, he did testify, "Had I seen the—Had I been applying the brakes at that time I could have stopped." Holcomb further testified that the stopping distance of the truck would be 150 feet at thirty miles an hour, "not counting perception and reaction and brake lag time." The record further discloses that Holcomb did not slacken the speed of his truck until approximately forty feet from the point of impact, although, as stated above, he could have seen Mrs. Liebau entering the intersection when he was 400 feet away and did see her in the intersection when he was 115 feet therefrom.

Witness Seitz testified he was driving north on High Street immediately behind the Liebau car; that Mrs. Liebau stopped at the stop sign before entering the intersection and he saw the Bracy truck crossing the Missouri Pacific tracks approximately 400 feet from the point of impact and traveling thirty miles an hour; that he watched the truck almost continuously up to the collision; that when the truck was about forty feet from the point of impact he heard the truck's horn and Mrs. Liebau was then in the intersection; also, that when the truck was forty feet from the Liebau car there was nothing obstructing Eighth Street to the east and to the south. A Mr. Hanna testified that the truck was traveling twenty-eight to twenty-nine miles an hour when it was fifty feet from the point of impact.

No useful purpose would be gained in narrating other evidence. Suffice it to say, there was an abundance of evidence to show negligence on the part of the appellants and to justify the lower court's overruling appellants' motion for judgment at the close of all the evidence. Moreover, there was sufficient competent evidence to sustain the general verdict and the answers to the respective special questions finding negligence on the part of appellants as the proximate cause of plaintiff's serious injuries. The judgment of the trial court is affirmed.

It is so ordered.

PRICE, J., being of the opinion that under the facts and circumstances it was an abuse of discretion to deny the motion for a continuance, dissents.